UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

HERBALIFE NUTRITION LTD.,

    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**INFORMATION**</u>

20 Cr. ___ ( )

**20 CRIM 443**

### COUNT ONE
**(Conspiracy to Violate the Books and Records
Provisions of the Foreign Corrupt Practices Act)**

The United States charges:

**<u>Relevant Statutory Background</u>**

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, et seq. ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of obtaining or retaining business for, or directing business to, any person.

2. The FCPA's accounting provisions require, among other things, that any issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78l, or required to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 15(d) of the Securities Exchange Act, Title 15, United States, Code, Section 78o(d) (hereinafter "issuer") make and keep books, records, and accounts that accurately and fairly reflect the transactions and disposition of the company's assets. 15 U.S.C. § 78m(b)(2)(A). The FCPA's accounting provisions also make

criminal the knowing and willful falsification of an issuer's books, records, or accounts. 15 U.S.C. §§ 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

## Relevant Entities and Individuals

3. Herbalife Nutrition Ltd. ("HERBALIFE" or the "Company"), the defendant, was a company that sold health care, personal care, and other products in more than 90 countries around the world, including China. HERBALIFE was headquartered in Los Angeles, California and maintained a class of securities pursuant to Section 12(b) of the Securities Exchange Act of 1934, which traded on the New York Stock Exchange under the ticker symbol HLF. HERBALIFE was required to file periodic reports with the United States Securities and Exchange Commission (the "SEC") under Section 15(d) of the Securities Exchange Act. HERBALIFE was an "issuer" as that term is used in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Sections 78dd-1(a) and 78m.

4. HERBALIFE, the defendant, conducted business operations in China through a group of wholly-owned subsidiaries based in China: Herbalife (Shanghai) Management Co., Ltd.; Herbalife (China) Health Products Ltd.; Herbalife (Jiangsu) Health Products Ltd.; and Herbalife NatSource (Hunan) Natural Products Co. Ltd. (collectively "Herbalife China"). By 2016, Herbalife China was responsible for approximately $860 million, or approximately 20%, of HERBALIFE's worldwide annual net sales, which exceeded $4 billion.

5. In China, to engage in direct selling—selling a company's products through independent sales representatives—Chinese law required a company to obtain a direct selling license from national authorities as well as local authorities for each province in which a company intended to engage in direct selling. Between March 2007 through 2016, Herbalife China obtained licenses to engage in direct sales in 28 provinces.

6. Herbalife China's External Affairs Department ("EA") was responsible for interfacing with Chinese governmental agencies and Chinese government-owned media entities on behalf of HERBALIFE, the defendant, in China.

7. Yangliang Li, a/k/a "Jerry Li," who is not charged as a defendant herein, was the Director of Sales and/or Sales Vice President at Herbalife China from in or about 2004 through in or about December 2007, and then the Managing Director of Herbalife China from in or about December 2007 through in or about April 2017. As the Managing Director of Herbalife China, Li was the most senior employee of HERBALIFE, the defendant, in China, and he was primarily responsible for many of Herbalife China's day-to-day operations, including sales. From in or about December 2012 through in or about February 2017, Li also held the title of Senior Vice President at HERBALIFE.

8. Hongwei Yang, a/k/a "Mary Yang," who is not charged as a defendant herein, was a high-level executive at Herbalife China and the head of EA from in or about 2006 through in or about April 2017. Li was Yang's direct supervisor.

9. "Herbalife China Executive 1," whose identity is known to the United States and HERBALIFE, the defendant, was a high-level executive of Herbalife China from at least January 2005 through in or about August 2007.

10. "Herbalife China Executive 2," whose identity is known to the United States and HERBALIFE, the defendant, was an employee of Herbalife China with responsibility for certain aspects of Herbalife China's finances and internal accounting controls from at least in or about 2007 through at least in or about April 2017.

11. Various provincial and central levels of a Chinese government agency (collectively, "Chinese Government Agency 1") were responsible, at least in part, for issuing

3

licenses required for companies, such as Herbalife China, to conduct direct selling in China. Chinese Government Agency 1 was a "department" and "agency" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

12. Various provincial and central levels of a Chinese government agency (collectively, "Chinese Government Agency 2") were responsible, at least in part, for enforcing compliance with Chinese laws applicable to direct selling companies, such as Herbalife China. Chinese Government Agency 2 had the authority to conduct investigations into direct selling companies and to pursue and impose fines and other penalties against direct selling companies that it deemed non-compliant with applicable laws. Chinese Government Agency 2 was a "department" and "agency" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

13. A media company in China ("State-Owned Media Outlet") published articles about business and other issues in China. State-Owned Media Outlet was owned and controlled by an agency or department of the Chinese government and performed a function of the Chinese government. State-Owned Media Outlet was an "instrumentality" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1)(A).

**The Conspiracy to Maintain False Books and Records**

*Overview of the Scheme*

14. Beginning in or about at least 2007 through in or about 2016, the Company, through Li and others, engaged in a scheme to falsify books and records and provide corrupt payments and benefits to Chinese government officials, including officials of Chinese Government Agencies 1 and 2 and State-Owned Media Outlet, for the purpose of obtaining, retaining, and

increasing Herbalife's business in China by, among other things, (1) obtaining and retaining certain of Herbalife China's direct selling licenses; (2) improperly influencing certain Chinese governmental investigations into Herbalife China's compliance with Chinese laws applicable to its business; and (3) improperly influencing certain Chinese state-owned and state-controlled media for the purpose of removing negative media reports about Herbalife China.

15. During this timeframe, in order to conceal these improper payments and benefits, HERBALIFE, the defendant, through Li and others, knowingly and willfully conspired and agreed with others to maintain false accounting records that did not accurately and fairly reflect the transactions and dispositions of HERBALIFE's assets, by, among other things, falsely recording certain improper payments and benefits as "travel and entertainment expenses" and maintaining false Sarbanes-Oxley sub-certification letters in HERBALIFE's books, records, and accounts.

*Improper Payments and Benefits and Falsification of Related Records in Connection with Herbalife China's First Direct Selling License and Investigations*

16. In or about late 2006, Herbalife China applied to the Chinese government for its first direct selling license, which was for two cities in one province in China (the "Province"). Chinese Government Agency 1 was the Chinese government agency responsible for awarding direct selling licenses in China, and Chinese Government Agency 1 also was required to solicit input from Chinese Government Agency 2 during the licensing process. During the time period that Herbalife China's application for its first direct selling-license was pending—from at least in or about December 2006 through in or about March 2007—the Company provided improper payments and benefits to officials of Chinese Government Agencies 1 and 2, and falsely recorded and booked them.

17.     For example, in or about December 2006, Chinese Government Agency 2 officials closed an Herbalife China store in a provincial capital. A few days later, during a telephone call in or about December 2006, two sales managers at Herbalife China discussed paying provincial officials in order to lower the fine amount associated with the closing of the store. One of them said to the other: "I told Mary [Yang] that we should start negotiation at 80 and then lower it down to 70. I told the district bureau director that I would give 3 yuan for every 10 yuan lowered."[1]

18.     In or about December 2006, Li and Yang discussed Li's approval of giving "red envelopes"—*i.e.*, cash payments—to Chinese Government Agency 2 officials, and obtaining reimbursement from Herbalife China for these red envelopes through reimbursement requests that falsely represented the expenditure.

19.     In or about January 2007, Li and Yang discussed that Yang had "taken care of" a Chinese Government Agency 1 official before Yang had to address questions from that official related to Herbalife China's pending direct selling license application for the Province. Li stated, "[T]he money works well on him!"

20.     In or about March 2007, Li asked Yang if she agreed with making cash payments totaling 35,000 yuan to various Chinese Government Agency 2 officials, including 10,000 yuan to an official whom Li identified as a deputy director, for the purpose of minimizing future penalties against Herbalife China. Yang responded, "Okay," so long as their colleague could "guarantee this . . . to be effective." Li then said, "I was thinking it would be better to spend money beforehand than spend money afterwards. This money is a small sum after all, and if we were to be penalized, the figure will be much greater."

---

[1]     All the conversations that are quoted in paragraphs 17 to 29 of this Information, unless otherwise noted, occurred in Mandarin and have been translated into English.

6

21.     In or about March 2007, Yang told an Herbalife China EA employee to distribute gift cards to Chinese government officials, including Chinese Government Agency 1 officials who were involved in Herbalife China's pending direct selling license application in the Province, and one non-government official potentially involved in media relations. Yang instructed, "Grab a pen and write down the gift list. Tell [another Herbalife China employee] you will go and pick up the money this afternoon. . . . Ask for 260,000 [yuan]. It will be sufficient." Yang directed that 200,000 yuan be provided to the non-government official, with the remaining amount distributed in gift cards to the government officials.

22.     That same day, Herbalife China Executive 1 and Li discussed making payments to Chinese government officials in connection with Herbalife China's pending direct selling application in the Province. Herbalife China Executive 1 told Li that he was calling to talk about "what I spent to take care of things for our license." Herbalife China Executive 1 added that "[Yang] is pressing me about that. I already took 10 out of the bank and gave it to her."

23.     The following day, Herbalife Executive 1, who was then an officer and high-level executive of HERBALIFE, the defendant, had a telephone call with Herbalife China Executive 1. During the call, which occurred in English, Herbalife China Executive 1 described to Herbalife Executive 1 how Herbalife China had obtained a license from Chinese Government Agency 1 for two cities in the Province and the plan to obtain licenses in other provinces. Herbalife China Executive 1 then raised concerns regarding an addendum to the "Improper Payments and Related Actions" policy—which had been enacted just three days earlier—that required approval from HERBALIFE's senior management in Los Angeles for Herbalife China personnel to entertain any Chinese government official more than six times per year. In response to these

concerns, Herbalife Executive 1 suggested that Herbalife China personnel falsify the details of the requests and the associated expense reimbursement documents:

| | |
|---|---|
| Herbalife Executive 1: | I am sure there [are] a lot of government officials, you can put different names down. |
| Herbalife China Executive 1: | Yes. |
| Herbalife Executive 1: | With six-person dinner, but I didn't tell you that. |
| Herbalife China Executive 1: | Yeah, but again like with the license process, you know, it's tough for me to use all the names, so — it's something you guys want to think about. Is that do you want to put the onuses back on your folks or [Herbalife Executive 2], which is not fair, I think. |
| Herbalife Executive 1: | How would anybody ever know, [Herbalife China Executive 1]? |
| Herbalife China Executive 1: | Yeah, okay, sure, I understand. |
| Herbalife Executive 1: | Right. |
| Herbalife China Executive 1: | Okay, the situation looks very good. |
| Herbalife Executive 1: | All the auditor is going to do is pick up your receipts, your expense reports and say, "Oh, he did Mr. X, Mr. A, Mr. B, Mr. C, Mr. D, and he did a few of these guys a couples of time but that was it." |

24. That same day, Herbalife China Executive 1 and Yang discussed a meeting between Yang and a Chinese government official. Herbalife China Executive 1 asked Yang, "did you pay him off today?" Yang responded, "definitely." Also on that day, Chinese Government Agency 1 issued to Herbalife China its first direct selling license for two cities in the Province.

*Further Improper Payments and Benefits to Government Officials and
Further Falsification of Books and Records*

25. After Herbalife China obtained its first direct selling license, the Company, through Li and others, continued to provide improper payments and benefits to Chinese government officials, and to falsely record them. The foreign officials who benefited from this scheme included officials of Chinese Government Agencies 1 and 2 and State-Owned Media Outlet. For example:

8

a.     In or about May 2007, Yang had a telephone call with Herbalife China Executive 1 during which they discussed paying 10,000 yuan to a Chinese government official to reduce a government fine to the equivalent of $100,000 or less. About one week later, in or about June 2007, Herbalife China Executive 1 told Herbalife Executive 2, who was then an officer and a high-level executive of HERBALIFE, the defendant: "So it looks like it's going to be less than or close to a 100,000 fine and that's it. The rest of it, you know, the consultants are taking care of this."

b.     In or about January 2012, an EA Assistant Director spoke during a telephone call with an EA Assistant Manager responsible for processing reimbursement requests, and the EA Assistant Manager proposed that the EA Assistant Director submit false reimbursement requests related to the submission of approximately $87,000 of fake meal and gift invoices.

c.     In or about September 2012, Yang told Li during a telephone call about an issue that Herbalife China was facing with Chinese Government Agency 2 in a particular municipality. Yang then told Li that EA had several months earlier spent approximately 20,000 yuan on a shopping trip and a spa visit for a senior Chinese Government Agency 2 official in the municipality, his daughter, and her classmates.

d.     In or about November 2012, Yang told Li during a telephone call: "[T]he son of [a senior municipal Chinese Government Agency 2 official] is studying at [a Chinese University]. They have a thing about going to a work unit for an internship, they require reviews from the places where he did the internships. Our company is on his list of internships. I don't know why. His dad saw that and asked us if our company could help him out and provide his son with a review . . . and affix our company's stamp." Li responded, "Sure, no big deal."

e.  In or about January 2013, Li and Herbalife China Executive 2 agreed during a telephone call to open a bank account at a Chinese bank for the purpose of benefiting the son of a Chinese Government Agency 2 official, who had recently begun working at the bank. Li and Herbalife China Executive 2 agreed to do so even though there was no legitimate business purpose for Herbalife China to open the new account.

f.  In or about April 2013, Yang told Li during a telephone call that she had met with an official at State-Owned Media Outlet who previously had refused to withdraw certain articles about Herbalife China. Yang told Li that the official "ate what he should eat, drank what he should drink, and used what he should use." Yang further told Li that after she said to the official, "[I]f you destroy[] us, where could you get money?", the official had agreed to withdraw the articles. Li responded, "You have done a great job!"

g.  In or about March 2014, an EA Assistant Director and another EA employee, during a call, discussed falsifying a reimbursement request in the amount of 20,000 yuan related to expenditures involving deputy directors of an unspecified government agency.

26.  Yang and other EA employees routinely falsified expense reports and receipts. For example, in the six-month period between in or about July 2012 and in or about December 2012, Yang received approximately (a) $772,433 in reimbursement for purportedly entertaining 4,312 government officials and media personnel at 239 meals, or more than one meal per day, and (b) $248,622 in reimbursement for purported gifts to Chinese officials and media personnel. HERBALIFE, the defendant, employees and executives, including Li, Herbalife Executive 1, and others, regularly received and reviewed reports from HERBALIFE's Internal Audit department showing the purported expenditures by Yang and EA on entertaining government officials and media personnel, including these purported meals and gifts.

27. In another example, between in or about September 2015 and in or about October 2016, Li, Yang, and others approved reimbursement of 920,000 yuan for the purported purchase of gifts from a particular vendor. These gifts, which were purportedly for Chinese government officials and media personnel, were fruits and vegetables from a farm near the city where Li and Yang were from. Li, and in some instances Yang, approved reimbursement to Yang and other EA employees for receipts showing more than 30 tons of purported produce purchases—without any documentation indicating that any produce was actually shipped.

28. In or about November 2007, Herbalife Executive 3, who was then an officer and a high-level executive of HERBALIFE, the defendant, told Li: "I kind of want to live in Shanghai, but for legal reasons . . . if I live in Shanghai, it's too risky for me. . . . There's something called the FCPA, the Foreign Corrupt Practices Act and all of that stuff."

29. Between in or about 2007 and in or about 2016, the books of HERBALIFE, the defendant, reflected that Herbalife China reimbursed EA employees more than $25 million for purportedly entertaining and giving gifts to Chinese government officials and Chinese media personnel, including Chinese state-owned media personnel, some of which was used for improper purposes.

*HERBALIFE's False Books and Records*

30. HERBALIFE, the defendant, as an issuer of securities, was required to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets. 15 U.S.C. § 78m(b)(2). Herbalife China's books, records, and accounts were consolidated into HERBALIFE's financial statements, including the financial statements that HERBALIFE filed with the SEC. HERBALIFE, through Li and others, knowingly and willfully conspired and agreed with others to falsely record in the

Company's internal accounting records reimbursement of the improper payments and benefits that were provided in association with the schemes described above. By recording reimbursements for these payments and benefits as legitimate expenses, such as travel and entertainment expenses, the Company, through Li and others, concealed the true nature of these payments and benefits and maintained false books, records, and accounts that did not accurately and fairly reflect the transactions and dispositions of its assets.

31. Furthermore, as part of the conspiracy, from at least in or about 2008 to in or about February 2017, on a quarterly and annual basis, Li, who participated in the scheme to falsify books and records and provide improper payments and benefits to Chinese government officials, signed and transmitted false Sarbanes-Oxley sub-certification letters in connection with the Company's quarterly and annual filings with the SEC ("SOX Sub-Certifications"). These false SOX Sub-Certifications were maintained by HERBALIFE, the defendant as part of its books, records, and accounts.

*Means and Methods of the Conspiracy*

32. The means and methods by which HERBALIFE, the defendant, and its co-conspirators sought to accomplish the object of the conspiracy included, among other things, the following:

a. HERBALIFE provided corrupt payments and benefits to Chinese government officials, including officials of Chinese Government Agencies 1 and 2 and State-Owned Media Outlet, for the purpose of obtaining, retaining, and increasing Herbalife's business in China by, among other things, (1) obtaining and retaining certain of Herbalife China's direct selling licenses; (2) improperly influencing certain Chinese governmental investigations into Herbalife China's compliance with Chinese laws applicable to its business; and (3) improperly

influencing certain Chinese state-owned and state-controlled media for the purpose of removing negative media reports about Herbalife China.

    b.  HERBALIFE, in order to conceal these payments and benefits, maintained false accounting records that did not accurately and fairly reflect the transactions and dispositions of Herbalife's assets, by, among other things, falsely recording certain improper payments and benefits as "travel and entertainment expenses" and maintaining false Sarbanes-Oxley sub-certification letters in Herbalife's books, records, and accounts.

## Statutory Allegation

    33.  From at least in or about 2007 though at least in or about 2016, in the Southern District of New York and elsewhere, HERBALIFE, the defendant, together with Yangliang Li, a/k/a "Jerry Li," and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, to violate the books and records provisions of the FCPA, in violation of 18 Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a).

    34.  It was a part and object of the conspiracy that HERBALIFE, the defendant, being an issuer which had a class of securities registered pursuant to the Securities and Exchange Act of 1934, together with Yangliang Li, a/k/a "Jerry Li," and others known and unknown, would and did knowingly and willfully falsify books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of HERBALIFE's assets, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff(a).

### Overt Acts

35. In furtherance of the conspiracy and to effect the illegal object thereof, HERBALIFE, the defendant, and its co-conspirators committed or caused the commission of the following overt acts, among others, in the Southern District of New York and elsewhere:

　　a. In or about January 2012, an EA Assistant Director spoke during a telephone call with an EA Assistant Manager responsible for processing reimbursement requests, and the EA Assistant Manager proposed that the EA Assistant Director submit false reimbursement requests related to the submission of approximately $87,000 of fake meal and gift invoices.

　　b. In or about September 2012, Yang told Li during a telephone call about an issue that Herbalife China was facing with Chinese Government Agency 2 in a particular municipality. Yang then told Li that EA had several months earlier spent approximately 20,000 yuan on a shopping trip and a spa visit for a senior Chinese Government Agency 2 official in the municipality, his daughter, and her classmates.

　　c. On or about February 4, 2013, HERBALIFE, through Li and others, created and maintained a false record, to wit, a SOX Sub-Certification relating to HERBALIFE's 2012 Form 10-K.

　　d. In or about March 2014, an EA Assistant Director and another EA employee, during a call, discussed falsifying a reimbursement request in the amount of 20,000 yuan related to expenditures involving deputy directors of an unspecified government agency.

　　e. On or about February 7, 2014, HERBALIFE, through Li and others, created and maintained a false record, to wit, a SOX Sub-Certification relating to HERBALIFE's 2013 Form 10-K.

   f. On or about October 21, 2016, HERBALIFE, through Li and others, created and maintained a false record, to wit, a SOX Sub-Certification relating to HERBALIFE's Form 10-Q for the third quarter of 2016.

      (Title 18, United States Code, Section 371.)

| | |
|---|---|
| *[signature]* | *[signature]* |
| ROBERT ZINK | AUDREY STRAUSS |
| Chief, Fraud Section | Acting United States Attorney |
| Criminal Division | Southern District of New York |
| U.S. Department of Justice | |

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

v.

**HERBALIFE NUTRITION LTD.,**

Defendant.

---

### INFORMATION

20 Cr. ___ ( )

(18 U.S.C. § 371.)

---

AUDREY STRAUSS
Acting United States Attorney
Southern District of New York

ROBERT ZINK
Chief, Fraud Section, Criminal Division, U.S. Department of Justice

---